UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| CONNIE SMITH, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. V-10-83 |
| | § | |
| DETAR HOSPITAL LLC, *et al*, | § | |
| | § | |
| Defendants. | § | |

MEMORANDUM OPINION & ORDER

Pending before the Court are a Motion for Partial Summary Judgment (Dkt. No. 31) and

Supplemental Motion for Summary Judgment (Dkt. No. 44) filed by Defendants DeTar Hospital

LLC ("DeTar"); Victoria of Texas, L.P.; DeTar Chief Executive Officer William Blanchard

("Blanchard"); DeTar Chief Operating Officer George Parsley ("Parsley"); DeTar Chief

Financial Officer Donald Hagan ("Hagan"); and DeTar Assistant Chief Financial Officer

Laurence Bludau ("Bludau") (collectively "Defendants"), to which Plaintiff Connie Smith

("Smith") has responded (Dkt. Nos. 32, 33, 45, 47, 48) and Defendants have replied (Dkt. Nos.

34, 46). After considering the motions, responses, replies, record, and applicable law, the Court

is of the opinion that Defendants' motions for summary judgment should be **GRANTED**.

I.   **Factual and Procedural Background**

Smith was employed by Victoria of Texas L.P., also referred to as DeTar Healthcare

System, as a staff accountant for approximately 10 years. Smith's immediate supervisor was

Defendant Bludau. Smith normally received good reviews throughout her employment; however,

this began to change when DeTar switched to a different accounting system in the fall of 2008.

After that change and corresponding marital problems, Smith began having difficulty completing

her work assignments on time. After missing a number of important deadlines, Smith received a written disciplinary warning for poor performance in September 2009 (Dkt. No. 31, Ex. C).

On February 12 and March 5, 2010, Smith complained to Kristine Elsik, the Director of Human Resources ("Elsik"), about how Bludau was treating her. Although Smith made a number of complaints about Bludau unrelated to this litigation, the following alleged conduct is relevant here:

- Sometime in 2007, while Smith was working under another supervisor, Bludau remarked, "Nice cleavage. You will probably do good on your evaluation today."
- On one occasion in late 2007, Bludau showed Smith and another staff accountant, Angela Matula ("Matula"), an e-mail with multiple full length photos of naked women on his computer and enlarged his favorite.
- On two or three occasions in 2007 and 2008, Smith went to happy hour at a bar with Bludau and other coworkers. On one occasion, Bludau kissed Smith and Matula.
- In September 2008, Bludau hugged and kissed Smith and Matula good night after walking them to their car following his daughter's wedding reception.
- In 2008, 2009, and 2010, Bludau required that Smith and Matula have lunch with him almost every day or he would get upset. On one occasion, Bludau asked Smith and Matula "which one are [you], the receiver or the giver?" and boasted that he was a "giver."
- On February 5, 2010, Bludau made a comment that Smith interpreted as suggesting that she was wearing red lingerie.
- Bludau called the women in his department "his girls" but stopped when they asked him to do so.
- Bludau referred to himself as "Daddy" and signed a birthday card for Smith as "Daddy."
- Bludau named three of the cows at his ranch after women in the accounting department, including Smith and Matula.

On March 5, 2010, Elsik sent her written report regarding Smith's complaint (Dkt. No. 32, Ex. 8) to the compliance department at Community Health Systems (CHS), which is DeTar's parent company. On March 10, 2010, Defendant Blanchard received written notice from CHS that Smith had made a sexual harassment complaint against Bludau, along with a copy of Elsik's report. Blanchard initially asked Elsik to investigate Smith's complaint and to get a written

statement from Smith so that DeTar would know exactly what Smith's allegations were. Smith admitted that Elsik asked her several times to put her complaint in writing and that she assured Elsik that she would, but Smith never did complete a written statement.

Between March 10, 2010 and April 12, 2010, no one at DeTar was actively investigating Smith's allegations of sexual harassment against Bludau. According to Blanchard, the delay was mainly due to the fact that DeTar had been considering terminating Elsik at that time for performance problems, and his attention was focused on that matter, which Blanchard admittedly considered to be more important than Smith's complaint. Blanchard further testified that, based on an alleged pattern of untrustworthy behavior exhibited by Elsik in the past, he suspected that Elsik may have put Smith up to making a false sexual harassment complaint. For this reason, Blanchard asked Defendant Parsley to resolve Smith's complaint.

Beginning April 12, 2010 and ending sometime after April 19, 2010, Parsley and Elsik investigated Smith's complaint by interviewing all of the personnel in the accounting office. They all denied witnessing any alleged inappropriate behavior by Bludau, and Bludau denied engaging in any sexually harassing behavior.

Meanwhile, on April 5, 2010, Bludau sent an email to Smith, Matula, and another staff accountant, Ruby Weitzel, that an "audit pack" would be due on Monday, April 19, 2010 (Dkt. No. 31, Ex. E). This was a substantial project that required each accountant to prepare a number of documents for submission to the accounting office of DeTar's management company. On Wednesday, April 14, Smith put a paid time off form in Bludau's mail bin to be off that Friday. On Thursday, April 15, Smith sent a text to Bludau stating that she was not feeling well and would not be coming in that day, and that she had to take her daughter to Dallas for a volleyball tournament the following day. Even though Smith did not come to work on Thursday, she did

call Elsik to say that she may need to take leave under the Family Medical Leave Act [FMLA] because she had learned roughly one month before that her mother had been diagnosed with pancreatic cancer. Elsik sent Smith the standard certified letter for employees who may be eligible for FMLA leave that same day.

Smith had not finished her portion of the audit pack when she left work on Wednesday, April 14, and she did not work the rest of the week. The following Monday, April 19, 2010—the day the audit pack was due—Smith came into the office around 8:00 A.M. and immediately went to get coffee with Matula. According to Matula, Smith was nervous and upset. At approximately 10:30 A.M., after an exchange where Smith told Matula that she suspected that her phone was being blocked because she was unable to call her husband, Smith told Matula that it was "horrible" and she could not take how they were treating her any longer; picked up a box with some family photos and other personal things in it; and asked Matula to bring her lamp home at the end of the day and if she could use her as a reference. Smith then asked Matula to tell Weitzel goodbye, but Matula insisted that she tell Weitzel herself. Matula also told Smith that she needed to tell Bludau or Parsley that she was leaving, but Smith said she couldn't. After telling Matula and Weitzel that she loved them and hugging them goodbye, Smith left with the box she had packed.

Bludau returned to the office roughly 20 minutes later. When Bludau asked where Smith was, Matula and Weitzel told him that Smith had quit. Shortly thereafter, Bludau informed Parsley and Blanchard that Smith had quit.

At 11:52 A.M., Elsik found out that Smith had apparently quit. Elsik then called Smith and left the following voicemail:

> *Elsik*: Hey, Connie. I just—I just walked through accounting and they said that you just said good-bye and walked out. What's going on? Did you—did you

resign? What's happening? Give me a call. Okay? I'll talk—I didn't know if they had talked to you, if they said something. I told them they had better settle down this morning and I stood up, so you need to let me know what has happened. Okay?

(Dkt. No. 44, Ex. F at 1.)[1]

Two minutes later, Elsik had a conversation with Parsley regarding Smith walking off the job:

> *Elsik*: Hey. Did you hear that she walked off the job? Connie. Yeah, . . . she went to two of her co-workers, said good bye, grabbed her personal effects and walked off. . . . She must have slept on it over the weekend and maybe the stress was too much with what's going on with her mom and she . . . I know she's got a lot going on with mom and she's stressed out over this, and—you know, but she just may have decided to cut and run. . . . The good news is that, you know, if there hasn't been a bona fide adverse action, then, you know, it's not a retaliation claim. . . . I just went in there and, you know, the girls said she had left. She said good bye to everybody and picked up her stuff and left. . . . She probably came in, knew that she had all those deadlines and just went, "I'm just—not doing this."

(Dkt. No. 44, Ex. G at 1—3.)

Parsley discussed the situation with Blanchard at 11:59 A.M. after which Parsley sent an e-mail to Elsik stating: "Kristina, I just got off the phone with Bill [Blanchard]. He wants to make sure that we will not take Connie back as an employee of DeTar Healthcare System under any circumstances." (Dkt. No. 31, Ex. K.) Blanchard testified that he felt this way because he was aware of Smith's performance issues, but also admitted that he was relieved when Smith voluntarily quit.

---

1.  The day after Defendants filed their original Motion for Partial Summary Judgment, Elsik turned over more than 1,000 hours of tape recorded conversations that she had made from wearing a tape recorder to work every day, which included recordings of conversations of critical events in this case. Plaintiff "agrees that the recordings capture some conversations" but nonetheless objects to their admissibility, claiming that the recordings and transcripts are unauthenticated and that "it is far from clear that there is an absence of material deletions, additions, or alterations in the relevant portions of the recording." (Dkt. No. 45 at 27.) Smith's claim that the tapes are unauthenticated is without merit. Parsley and Hagan both identify the voices as Smith, Elsik, and their own, and both testify that the recordings accurately reflect conversations that they had with Elsik. (Parsley Aff., Dkt. No. 44, Ex. W; Hagan Aff., Dkt. No. 44, Ex. X.) Furthermore, Smith does not dispute that the tapes accurately reflect conversations she had with Elsik. Accordingly, Smith's objection to the recordings is **OVERRULED**.

At 12:18 P.M., Elsik spoke to Smith for the first time that day, and the following exchange occurred:

> *Elsik*: Hey. You just threw in the towel, girl, or what?
> *Smith:* I don't know (inaudible).
> *Elsik*: Oh.
> *Smith*: It was sad (inaudible).
> *Elsik*: Are you serious?
> *Smith*: Yes, I am (inaudible).
> * * *
> *Elsik*: Well, you know you may still—you have the option of completing—did you get my certified letter yet with the FMLA?
> * * *
> *Smith:* Yeah, I did—I just got it. I mean (inaudible) last night.
> * * *
> *Elsik:* Where are you at?
> *Smith*: I was driving home and my sister called and said my mother (inaudible) her blood count is so low (inaudible).
> * * *
> *Elsik*: Okay. Here is what I want you to do. Connie, you're not in the best place to be making a decision right now. Okay? What I want you to do is I want you to get those papers filled out. Okay?
> *Smith*: Right.
> *Elsik*: And I want you to—oh, God. I'm going to have to guide you on this—on this a little bit. But you need to—you need to get that filled out. And I will—I'll kind of tap dance a little bit just to give you a little bit of time. But you really do not need to be walking off. You've got an FMLA, you should just take it. You need some time away, take some time away. You know what I'm saying?

(Dkt. No. 44, Ex. E at 1—3.)

Shortly thereafter, at 12:33 P.M., Elsik advised Parsley that Smith's mother had been taken to Citizens Hospital, another hospital in Victoria. At 12:44 P.M., a few minutes after Elsik got off the phone with Parsley, Elsik called Smith and instructed her as follows:

> *Elsik*: So here's the deal. Here is what I want you to do. You need to call Laurence [Bludau] right now and tell him about your mom. Right now. Say, I had to leave. My—you know, my mother is being brought in. There is—you know, she's not doing well. You know, I'll let you know as soon as I know something. And that's it. And if he says to you, why did you leave. Well, I told the girls I had to go. Don't say anything else. Just leave it in limboland. Nobody really knows what went on or why you left. So just leave it like that. Do that right now, so that

they—because otherwise it's job abandonment. Don't do that. You need some perspective.

(Dkt. No. 44, Ex. L at 2.)

By 12:50 P.M., Smith had left Citizen's Hospital. Rather than returning to DeTar, however, she went home. At 1:10 P.M., Elsik left a voice mail for Smith with further instructions:

> *Elsik*: Hey. Okay. I wanted to call you back while I wasn't with anybody, because I have to give you pretty specific instruction here.
>
>                               * * *
>
> All right. Here is the next thing. Do not neglect to call Laurence. Call him right away. Call him up and—you know, if you get his voice mail or whatever, call him and leave him a message about your mom. You have protection under FMLA. If you don't do that, then you can take time off. You can take a week, you can take a month, you can take 12 weeks. Okay? In light of what your mom is going through. I would rather see you do that than walk off your job. Okay? So call me. I'm about through with surveys. I'll talk to you later. Bye.

(Dkt. No. 44, Ex. M at 1.)

At 1:20 P.M., Elsik and Smith spoke again, discussing how Smith should call Bludau and falsely tell him that she had left work to be with her mother at the hospital, even though she did not receive the call concerning her mother until after she had already left work. They further discussed how, because Smith did not want to actually speak to Bludau, she would send him an e-mail falsely stating that she had tried to call him:

> *Elsik*: [W]hat you need to—look it, I know it's difficult. But I'm just saying, have one conversation. I guarantee you it's rougher for him at this point than it is for you.
> *Smith*: (Inaudible).
> *Elsik*: Okay. I'm just saying, I would make that phone call. Because that—you know, and it's not—well, follow it up with an e-mail, or make the phone call so that you—do it off of your cell phone so that you'll have record of making the call. And if there is no answer then say, hey, I—you know, then send an e-mail saying, I've tried to reach you by telephone, this is what's going on and, you know, I have an emergency. And—you know, but don't not do it. Because if you fail to do it—see, right now—right now, you don't have an adverse action. They can walk away smelling lily white like they've done nothing wrong. You can't allow that to happen. You have to hang tough. Okay? There has to be some adverse action or you don't have a case. Don't give it to them like that. They'll be skipping rope and going, oh, just let her go. Bye. Don't do that. Take advantage of

it. You've got FMLA, fill out that paperwork, get it to the—get it in to HR and we will put you on a leave. . . . You know, you've got to do it. You've got to—you've got to cowboy up for one phone call. And recognize that he's like a spider. He is more scared of you than you are of him. You have more – more damage to do to him than he does to you.

\* \* \*

*Elsik*: I know it's tough. I know right now you don't want to do it. But you've go to call him because you don't want them to claim that you're abandoning your job. Okay? You don't want them to have that on you. Regardless of how you feel today, tomorrow, the next day and forever, you know, you want to be able to—you want to be able to get unemployment, since now they're extending it for two years. You want to – you know what I'm saying? Don't give them anything, don't do that.

\* \* \*

*Elsik*: . . . Just say, I got—you know, just say, I'll take care of—just say, I've already contacted HR to let them know. That's all you need to say.
*Smith*: Say what?
*Elsik*: Just tell him you've already contacted me to let me know that you need leave time. They know that.

*Smith*: I know, but that's—instead of calling them, I want to e-mail them and say, by calling you that I reported to Kristina. His phone is a dinosaur, he has nothing on that phone.
*Elsik*: Okay. Well, then do it right now. Don't wait—don't wait five more minutes, and I would copy Don on it.
*Smith*: Yes, I will— . . .
*Elsik*: And say, you know—and say—
*Smith*: I'm just going to say, I tried calling you and leave a voicemail, you know that I had to leave for an emergency today. My mother is (inaudible) she was taken to the Citizens today—this morning.
*Elsik*: Yeah, I would. I would. I would. No, and just say—I would just say, it is—and just say, when I called Kristina, she was under the impression that I had walked off my job. But you were not available when I left and I tried to call you and wasn't able to reach you.
*Smith*: Like—okay. So you're saying that I should tell them that I had to leave for an emergency, you're saying I should say I got a hold of HR (inaudible).

\* \* \*

*Elsik*: Call me when you're done and read it to me when you're done. Call me and—like write it and then read it to me.
*Smith*: Okay. I'll do that.

(*Id.* at 2—10.)

At 1:44 P.M., Smith called Elsik again. Then at 1:48 P.M., Smith sent Bludau the following e-mail:

> I tried calling you earlier and since you do not have voicemail I am sending this email. I had an emergency earlier with my mother who has pancreatic cancer. She was taken to Citizens Hospital this morning.  Also, when I could not reach you I called Kristina about this emergency. I will let you know when I find out more.
>
> Sincerely, Connie.

(Dkt. No. 31, Ex. M.) After sending the email, Smith went by her mother's doctor's office and dropped off the FMLA forms. She also received a release from the doctor's office that had to be signed by her mother authorizing the release of her medical information.

Shortly before 3:00 P.M., Smith met with Elsik at DeTar in order to drop off her completed FMLA forms. Elsik told Smith to back date the original FMLA paperwork to April 16 so that it would look like she had completed the forms prior to walking off the job that morning. Elsik also told Smith to get the certification filled out by her mother's healthcare provider and return it to her as soon as possible. In the meantime, Elsik would give DeTar "the green light" to go ahead and terminate Smith's employment.

> *Elsik*: I'm going to give them the green light to do whatever they want to do. Whatever that is. So if they want to go ahead and terminate you, I'll say, well, go ahead.
> *Smith*: But you're saying I have to—
> *Elsik*: That's right. That's right. Because if what they want to do is be stupid and take adverse action, you've got about 15 different things right now lined up that they're going to wind up sued.

(Dkt. No. 31, Ex. P at 9.) Elsik also told Smith that if anyone from DeTar tried to call, she did not need to take their call. Instead, Smith should just sit back and watch what happens:

> *Elsik*: [L]et them tighten the noose on themselves. Just step back and just let them—whatever they're going to do. Because you have enough on the ball now—and they're getting bad advice. They're not getting sound HR advice. They're going over me and they're not getting good advice. And they've got someone telling them they can get away with anything and they're going to be sorry.
> *Smith*: So, Kristina, you let me know.

(*Id.* at 18—19.)

After Smith left Elsik's office, Elsik and Parsley spoke again about the situation. According to Elsik's sworn affidavit, on which Smith relies heavily to show that Defendants knew that she did not intend to abandon her job:

> Later that afternoon, I returned a call I had received from Mr. Parsley. I returned the call on my cell phone. According to my cell phone, this call was made at 2:59 p.m. When he answered, Mr. Parsley also had Mr. Hagan, and Mr. Bludau with him. They were on speakerphone. I was in my office. Mr. Hagan told me that Connie Smith had sent him an e-mail . . . and he essentially recited the content of the e-mail. Mr. Hagan recited it in a mocking tone of voice that clearly indicated that he found Ms. Smith's situation personally amusing and a source of humor to him. At this time, Mr. Hagan instructed me that I was to send Ms. Smith a letter terminating her for job abandonment. I again told them that Ms. Smith called and let me know where she was, and that the FMLA protected this time off, and they could not fire her under the FMLA.
>
> Despite that, they insisted that Ms. Smith was fired. Mr. Parsley and Mr. Hagan both said they "did not care" that Ms. Smith had taken time off that day only to care for her dying mother in a medical emergency and that I was to send her a letter terminating her employment for job abandonment, effective Monday, April 19, 2010. I continued to object to firing Ms. Smith and telling them all that Ms. Smith had not abandoned her job, had instead taken time to care for her terminally ill mother in a medical emergency, and could not be lawfully fired under the FMLA. Mr. Parsley and Mr. Hagan said they "did not care" and continued to instruct me to fire Ms. Smith for "job abandonment." At this point, it was clear that I could not change their mind about firing Ms. Smith, no matter what I said or did.
>
> Mr. Parsley and Mr. Hagan admitted to me that they knew Ms. Smith had not really abandoned her job, but ordered me to fire her on that false basis anyway. They did that even though I had specifically told them they could not do that legally under the FMLA.

(Elsik Aff., Dkt. No. 32, Ex. 1 ¶¶ 39—40.)

However, a tape recording of this conversation proves that the statements in Elsik's affidavit upon which Smith relies are significantly inaccurate or false.[2] First, the recordings show

---

2. The recorded conversations prove that numerous statements contained in Elsik's affidavit are inaccurate or false—for example, that Smith returned the completed FMLA form to Elsik on April 16 (¶ 27); that Smith told Elsik that she received a call about an emergency with her mother while she was still at work (¶ 32); that DeTar executives forced Elsik to send Smith a termination letter (¶ 43); that none of Defendants called Smith after she left work on the morning of April 19 (¶ 51). As a general matter, the Court "may not undertake to evaluate the

that Defendant Hagan did not say anything during this call—in fact, Hagan could not have been present in Parsley's office as Elsik claims, since it is undisputed that he was in Dallas that afternoon. While Elsik and Parsley did review Smith's email together, Parsley never said he "did not care" and in no way admitted to Elsik that he knew Smith had not really abandoned her job. Instead, Parsley told Elsik that he had doubts about Smith's story, and rightfully so:

> *Parsley*: Now, that all just strikes me as so much nonsense. I tried calling [Bludau] earlier. I—I seriously doubt that. If she had called, somebody would have gotten the call for Laurence well before 11:30 this morning.
> *Elsik*: Uh-huh.
> *Parsley*: I don't buy that (inaudible) a bit. Okay. He doesn't have voice mail. I thought we all had voice mail. We may not check it. I thought we all had voice mail.
> *Elsik*: No. I don't, but—
> *Parsley*: Okay. I hate voice mails. Okay. I'll let that one go. I had an emergency earlier with my mother who has pancreatic cancer. Maybe. Certainly her mom has pancreatic cancer, but an emergency? Okay. But, again, there was some—it doesn't seem to quite make sense.
> *Elsik*: Okay.
> *Parsley*: Was taken to Citizen's Hospital this morning. Okay. That could be the case.
> *Elsik*: Sure.
> *Parsley*: And, also, when I could not reach you, I called Kristina about this emergency. When I could not reach you? Connie, come on. Reaching people around here is as easy as calling—she could have called Angela, could have called Teresa, she could have called . . .
> *Elsik*: Yeah.
> *Parsley*: —could have called Cathy, she could have called Evelyn.
> *Elsik*: Right.
> *Parsley*: Dozens of people she could have called. She didn't make the effort to call. Now, that's just my reading the tea leaves, Kristina.
> *Elsik*: I'm all right with that. Read—read away.
> *Parsley*: But that's it. I mean, I'll let you know more when I find out. She walked off her job. She told Angela and Ruby—and I have not confirmed this yet, but this is something I learned—
> *Elsik*: Yeah.
> *Parsley*: —a little while ago, that to Angela and to Ruby, the last straw was when they blocked my phone.

* * *

---

credibility of the witnesses" at the summary judgment stage. *See Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). However, because the recorded conversations prove that Elsik's affidavit is replete with inaccurate or false testimony throughout, this testimony will be disregarded in its entirety.

> *Parsley*: We didn't block anybody's phone. But she says, the last straw was when they blocked my phone and I couldn't even dial out to talk to my husband.
> *Elsik*: I'm looking at my phone right here to tell you when I got the call from her, you know. It was 11:00-something. And it could have—shortly after—11:52 a.m. was when she called me.
>
> * * *
>
> *Parsley*: Uh-huh. So she—you told her that at about 11:30, and so two hours and 20 minutes later she sends an e-mail.
> *Elsik*: Yeah. I don't know where she was. She didn't tell me where she was. I don't know if she was at Citizen's or what the deal was . . .

(Dkt. No. 44, Ex. R at 1—6.)

Elsik also did not mention that she had just met with Smith, and at no time did Elsik tell Parsley that Smith had not intended to quit her employment. Instead, Elsik supported Parsley's belief that Smith had quit her employment and stated that she would support whatever DeTar needed to do:

> *Elsik*: [H]ere is what I'm going to say. Y'all—you know, if you—if you're at a point you feel comfortable, go with it. You know what I'm saying? I mean, if you feel like, you know, the—the news or the—can you get a statement from Angela and Ruby?
> *Parsley*: I—I think I'm going to walk over there and ask them if they can tell me what happened. Absolutely. And see if they'll document—Angela probably won't; Ruby might.
> *Elsik*: Right.Yep. And whatever was verbalized, then go with it.
> *Parsley*: Because I—I think she abandoned her job is what I think. But – okay. I'm willing to go one more step and find out what happened.
> *Elsik*: Well, I just think it's the dotting of the I's, crossing of the T's. Find out what they say. And if they say that their impression was was that she was, you know—you know, that she was resigning her position or whatever. I wish that it had been cleaner, that she had left a letter, but . . .
> *Parsley*: Yeah.
> *Elsik*: I don't know if she just—you know, being stressed, if she just snapped or what—you know, what the deal was. But whatever you need to do, I'm here. I'm—I'll support you, George, in whatever you need to do.
> *Parsley*: I appreciate it. Well, let me go see what I can find out and we'll talk again shortly.

(*Id.* at 7—8.)

At approximately 3:30 P.M., Parsley called Hagan and told him that Smith had quit. Hagan was driving back from Dallas at the time. Shortly thereafter, at approximately 4:12 P.M.,

Parsley called Elsik again and told her that he had confirmed the facts with Matula and Weitzel, and it appeared that Smith had indeed walked off the job. Elsik then gave Parsley the "green light," suggesting that her department would do a Personnel Action Form (PAF) to terminate Smith's employment. Elsik then called back to suggest that they send Smith a termination letter, but Parsley ultimately decided that they should not send a letter after Elsik admitted that it was not the normal practice. (Dkt. No. 44, Ex S.)

Hagan's cell phone records (Dkt. No. 44, Ex. Q-1 at 2) confirm that he tried calling Smith three separate times on her home phone between 4:30 P.M. and 6:00 P.M. that evening. According to Hagan, he let Smith's phone ring at least 10 times each call, but there was no answer. Smith admits being at home during that time period but denies receiving Hagan's calls.

The following morning, April 20, 2010, Smith did not show up to work for her regular 8:00 A.M. shift. Smith also did not call or email any of her supervisors in the accounting department to say that she was not coming in to work or to otherwise update them on when she anticipated she would return.

Shortly after 9:00 A.M., Elsik called Parsley and informed him that she was going to go ahead and write a letter to Smith terminating her employment, even though it was not DeTar's usual practice. When Parsely asked if a letter was "really necessary, then," Elsik convinced him that it was. (Dkt. No. 44, Ex. T at 1—2.) Elsik then drafted a termination letter for Smith and called Smith at 9:43 A.M. to read her the letter before she sent it:

> *Elsik*: I just drafted your certified letter. Yeah, so—luckily, they let me send it, you know.
>
> * * *
>
> *Elsik*: Here is what I—here's what I wrote. Dear Ms. Smith, I was advised yesterday, April 19th, by George Parsley—I wanted to name him—COO that the decision was reached to terminate your employment based on job abandonment. It was communicated to Mr. Parsley that you left the workplace taking personal items with you and advising that you, quote, needed to leave. Which doesn't

13

prove anything. While sometime later you contacted your supervisor to advise that your mother was urgently ill, a decision was reached to accept your position as having the job—abandoning your job. Effective April 19th, your employment with DeTar Health Care Systems is terminated. I left it just like that, short and sweet.

(Dkt. No. 44, Ex. U at 1—2; *See also* Dkt. No. 32, Ex. 1-E.) Smith and Elsik went on to discuss taking legal action against DeTar, including the specific details Smith should put in her Equal Employment Opportunity Commission (EEOC) Charge against DeTar and how Smith should also contact the Office of Inspector General (OIG):

> *Elsik*: Okay. What I—what we need to do today . . . is contact the OIG and the Austin office . . .
> *Smith*: Okay. (Inaudible).
> * * *
> *Smith*: What about the EEOC? I want to call them—
> *Elsik*: Yeah, yeah. You should file that too.
> *Smith*: And tell them and say – does it say in the letter that I was on FMLA or—
> *Elsik*: No, I didn't, but you are. You—yes. The minute you—Connie, the minute that you advise that you have a qualifying event—
> *Smith*: You and I talked about it last week.
> *Elsik*: Yeah. And the minute—when you sent that e-mail saying that your mother was ill, or when—even if you verbalize it and you say, my mother is ill, she has cancer, the minute that you tell them, they have to give it to you. That's what the law says. Whether you've filed paperwork or not. Now, I want you to get that medical certification in today. Can you do that?
> *Smith*: Yes, I can.
> *Elsik*: Okay. Okay.
> * * *
> *Smith*: I mean, I'm going to tell them that I was fired because of FMLA (inaudible).
> *Elsik*: Yes.
> *Smith*: Okay. Tell them everything.
> *Elsik*: Yes.
> *Smith*: (Inaudible) and I am to say the HR Director is aware of everything.
> *Elsik*: Is aware of everything.
> *Smith*: And also that—should I say that they're—
> *Elsik*: That they're retaliating against me, too.
> *Smith*: Right.
> *Elsik*: Yeah. Yeah.
> *Smith*: I'll tell them.
> *Elsik*: Okay. Okay. Rock and roll, girl.
> *Smith*: I know, girl.

* * *

*Elsik*: It's retaliation. You also have to have sexual harassment. Don't forget to mention that to the EEOC. Retaliation, whistleblower, sexual harassment. Okay?
*Smith*: Retaliation, whistleblower and (inaudible).
*Elsik*: And sexual harassment. File all of those, and then contact the OIG first.
*Smith*: Contact the OIG first?
*Elsik*: Yes, call them first. Because they're the big dogs. They'll come in here with the FBI. They will not f--k around.

* * *

*Elsik*: All right. Listen, I need you—I need you to make the call as soon as possible. When are you going to do it? Because when—you've got to make the call as soon as possible because Petrina is already onto it.
*Smith*: All right.

(Dkt. No. 44, Ex. U at 2—9.)

At no point did Smith ever attempt to return to her job at DeTar. Smith did not contact anyone at DeTar after she received the termination letter in order to explain the alleged misunderstanding, say that she had not intended to quit her job, ask about her request for FMLA leave, or to seek reinstatement. Instead, Smith went to Elsik's home to complete her EEOC Intake Questionnaire, had Elsik type up the statement that accompanied it, and then filed her Charge of Discrimination (Dkt. No. 31, Ex. R) with the EEOC on April 26, 2010—exactly one week after she walked off the job. After receiving a right to sue letter, Smith then filed the present lawsuit on September 22, 2010 alleging causes of action for interference and retaliation under the FMLA, sexual harassment and retaliation under Title VII of the Civil Rights Act of 1964, and defamation under Texas state law.

Defendants now move for summary judgment on all of Smith's claims on the grounds that she was not terminated at all, but instead abandoned her job and then conspired with Elsik to make her resignation look like a termination so that she could bring this lawsuit against Defendants.

15

## II.  Summary Judgment Standard

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Christopher Village, LP v. Retsinas*, 190 F.3d 310, 314 (5th Cir. 1999). "For any matter on which the non-movant would bear the burden of proof at trial . . . , the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial." *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718—19 (5th Cir. 1995); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323—25 (1986). To prevent summary judgment, the non-movant must "respond by setting forth specific facts" that indicate a genuine issue of material fact. *Rushing v. Kansas City S. Ry. Co.*, 185 F.3d 496, 505 (5th Cir. 1999).

When considering a motion for summary judgment, the Court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in favor of the non-movant. *See Samuel v. Holmes*, 138 F.3d 173, 176 (5th Cir. 1998); *Texas v. Thompson*, 70 F.3d 390, 392 (5th Cir. 1995). "The court may not undertake to evaluate the credibility of the witnesses, weigh the evidence, or resolve factual disputes; so long as the evidence in the record is such that a reasonable jury drawing all inferences in favor of the nonmoving party could arrive at a verdict in that party's favor, the court must deny the motion." *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). However, the non-movant cannot avoid summary judgment by presenting only "conclusory allegations" or "unsubstantiated assertions," such as the bare allegations of a complaint, but must present sufficient evidence, such as sworn

16

testimony in a deposition or affidavit, to create a genuine issue of material fact as to the claim asserted. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). "Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that 'the better course would be to proceed to a full trial.'" *Freeman v. U.S.*, 2005 WL 3132185, *2 (S.D. Tex. Nov. 22, 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

### III. Discussion

#### A. FMLA

Congress enacted the FMLA in 1993 to "entitle employees to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition . . . ." 29 U.S.C. § 2601(b)(2). Under the FMLA, an eligible employee is entitled to a total of 12 weeks of leave during any 12-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). After a qualifying absence, the employer must restore the employee to the same position or a position comparable to that held by the employee before the leave. 29 U.S.C. § 2614(a)(1).

A plaintiff may be entitled to recovery if she can prove that she was an eligible employee; that her employer interfered with, restrained, or denied her exercise of FMLA rights; and that she was prejudiced by the violation. 29 U.S.C. §§ 2615, 2617(a)(1); *see also Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). These claim touch on prescriptive or substantive FMLA rights and invoke entitlement or interference theories of recovery. *See Haley v. Alliance Compressor, LLC*, 391 F.3d 644, 649 (5th Cir. 2004). A plaintiff also may be entitled to recovery if her employer retaliates against her for exercising her FMLA rights. 29 U.S.C. §§ 2615, 2617.

Claims brought pursuant to the FMLA are not significantly different from similar claims brought pursuant to Title VII or other anti-discrimination laws. *Chaffin v. John H. Carter Co.*, 179 F.3d 316, 319 (5th Cir. 1999). Therefore, in the absence of direct evidence, courts analyze FMLA retaliation claims, like Title VII claims, under the burden-shifting approach first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and recently modified in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), and *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305 (5th Cir. 2004).

Under the "modified *McDonnell Douglas* approach," a plaintiff may trigger a presumption of discrimination by establishing a *prima facie* case. *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005); *Rachid*, 376 F.3d at 312. To establish a *prima facie* case of retaliation under the FMLA, a plaintiff must show that: 1) she engaged in a protected activity; 2) she suffered an adverse employment decision; and 3) causation connects the two. *Id.* Once a plaintiff has established a *prima facie* case, the burden shifts to the defendant to proffer a legitimate, non-discriminatory reason for its adverse employment action. *Id.* If the defendant satisfies this burden, then the presumption of discrimination dissolves. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142—43 (2000); *Price v. Fed. Express Corp.*, 283 F.3d 715, 720 (5th Cir. 2002). The plaintiff must then offer evidence tending to show "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motives alternative)." *Rachid*, 376 F.3d at 312 (internal quotation and alteration marks omitted); *see also Richardson*, 434 F.3d at 333 (analyzing FMLA retaliation claim under the modified approach). If the plaintiff shows that the illegal discrimination was a motivating factor, the defendant must respond with

18

evidence that the same employment decision would have been made regardless of discriminatory animus. *Rachid*, 376 F.3d at 312.

Here, Smith claims that Defendants interfered with her rights under the FMLA by not allowing her to take April 19, 2010 off work to care for her sick mother. Smith further claims that Defendants then terminated her in retaliation for exercising her right to take leave under the FMLA. Defendants move for summary judgment on both of Smith's FMLA claims on the grounds that Smith was not terminated but instead voluntarily resigned.

With respect to Smith's interference claim, Defendants correctly argue that former employees are not eligible for prescriptive protections from their former employers under the FMLA. *Pownall v. City of Perrysburg*, 63 Fed. App'x 819, 824 (6th Cir. 2003) (affirming summary judgment in favor of employer on employee's FMLA claim where employee initially requested FMLA leave but then voluntarily resigned before employer had an opportunity to make a decision on whether to grant leave); *Hammon v. DHL Airways, Inc.*, 980 F. Supp. 919, 927 (S.D. Ohio 1997) (granting summary judgment for employer where employee resigned from his position, and, "as a former employee, he was not an 'eligible employee,' and therefore he was not entitled to the protections afforded by the FMLA").

With respect to Smith's FMLA retaliation claim, Defendants correctly explain that because Smith's resignation preempted any potential termination, Smith did not suffer an adverse employment action sufficient to establish a *prima facie* case of retaliation. *See Mowbray v. Am. Gen. Life Co.*, 162 Fed. App'x 369, 374 (5th Cir. 2006) ("[Plaintiff] did not suffer an adverse employment action because she opted to resign and collect her severance package before Defendants-Appellees made an ultimate employment decision regarding her position . . . ."); *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 709 (5th Cir. 1997) (holding that the plaintiff's

resignation, which preempted a possible termination, was insufficient to prove adverse employment action); *Hribek v. Buc- Ee's, Ltd*., 2007 WL 1452654, *4 (W.D. Tex. May 15, 2007) (granting summary judgment on FMLA retaliation claim where plaintiff "knew his job was in jeopardy due to performance issues and chose to resign"); *Chandler v. La Quinta Inns, Inc*., 2007 WL 1098752, *4 (W.D. La. Apr. 11, 2007) (granting summary judgment where employee took FMLA leave, returned to work, then resigned because she feared that she was going to be terminated due to performance issues).

Moreover, even assuming Smith had changed her mind and later wished to rescind her resignation, courts have repeatedly held that an employer has no duty to reinstate an employee once she voluntarily resigns. *Pownall*, 63 Fed. App'x at 823 ("[O]nce [plaintiff]'s voluntarily resignation took effect, she had no right to revoke it, and the [defendant] had no duty to reinstate her."); *MacLean v. City of St. Petersburg*, 194 F. Supp. 2d 1290, 1303 (M.D. Fla. 2002) (granting summary judgment on employee's FMLA retaliation claim where employee voluntarily resigned after she was approved for FMLA leave, finding that employer had complete discretion as to whether to accept her resignation or allow her to rescind it); *Hammonds v. Hyundai Motor Mfg. Ala., LLC*, 2011 WL 2580168, *4 (M.D. Ala. June 28, 2011) ("So long as the resignation was voluntary and not a result of coercion or duress, there is no constructive discharge and the failure to accept rescission of a voluntary resignation is not an adverse employment action.").

Smith attempts to distinguish these cases because she did not submit a resignation letter and never used the explicit phrases "I quit" or "I resign" when she left DeTar on the morning in question, and summary judgment is therefore precluded because a fact issue exists as to whether she was terminated or voluntarily resigned.

Smith initially offered her sworn deposition testimony as evidence that she did not intend to abandon her job, but only hurried out of work the morning of April 19, 2010 because she had received a call from her sister informing her that her mother was being rushed to the hospital for a medical emergency. (Smith Dep., Dkt. No. 32, Ex. 2 at 248:17—249:9.) According to Smith, at the time she left, "[her] mindset was on [her] mother only." (*Id.* at 262:16—263:3.) After Defendants offered evidence of the recorded telephone conversation in which Smith told Elsik that she did not receive her sister's call until after she had already left DeTar, Smith's story changed. Smith's recent affidavit states that she left work the morning of April 19 because she was "totally stressed out . . . from the retaliation towards [her] from Lawrence Bludau," and the fact that Bludau's office was only a few feet from hers made her "really uncomfortable and anxious." (Dkt. No. 45, Ex. 1 ¶¶ 2, 3.) "The Fifth Circuit has held a plaintiff may not create a material fact issue with an affidavit that impeaches prior testimony without explanation." *David G. Ocampo v. Laboratory Corp. of America*, 2005 WL 2708790, *16 n.234 (W.D. Tex. Sept. 6, 2005) (citing *S.W.S. Erectors, Inc. v. Infax, Inc.*, 72 F.3d 489, 495 (5th Cir. 1996); *Thurman v. Sears, Roebuck, & Co.*, 952 F.2d 128, 136 n.23 (5th Cir. 1992)). Because Smith has provided no explanation for her changed testimony, and her contradictory statements cannot be reconciled, her affidavit testimony will not be considered.

Smith further argues that retaliation under the FMLA must be inferred because she has offered evidence that she often left work without telling Bludau and "pretty much came and left work as she pleased before April 19, 2010, and was never disciplined, much less fired, for it" (Dkt. No. 32 at 9). The Court is not persuaded by this argument, however, as there is no evidence that Smith packed up her personal effects and said her goodbyes on any of these prior occasions.

Although all reasonable inferences must be drawn in Smith's favor at this stage, the Court finds that no reasonable juror could conclude that Smith did not intend to quit, resign, abandon her job, or otherwise end her employment with DeTar when she: (1) packed up family photographs and other personal belongings from her office; (2) told Matula that it was horrible how they were treating her and that she couldn't take it anymore; (3) asked Matula if she could use her as a reference and to bring her lamp home at the end of the day; (4) told Matula and Weitzel that she loved them and hugged them goodbye; (5) left the premises with the box containing her personal belongings; (6) did not deny walking off the job when Elsik called later that morning to ask if she had "thrown in the towel;" and (7) never attempted to contact Defendants or anyone else at DeTar after receiving the termination letter in order to explain that she had not intended to abandon her job or to seek reinstatement. Matula and Weitzel both testified that this was the conclusion they reached, and except for her own self-serving deposition testimony that she did not intend to abandon her employment, Smith has failed to present any corroborating evidence to support her claim that she was terminated. Self-serving testimony, without more evidence, will not defeat summary judgment. *Sanchez v. Dallas/Fort Worth Intern. Airport Bd.*, 438 Fed. App'x 343, 346 (5th Cir. 2011) (citing *DIRECTV, Inc. v. Budden,* 420 F.3d 521, 531 & n.49 (5th Cir. 2005)).

Accordingly, Defendants' motion for summary judgment with respect to Smith's FMLA interference and retaliation claims is **GRANTED**.

## B. Title VII

### 1. Hostile Work Environment Sexual Harassment

Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Sexual harassment is a form of sex discrimination under Title VII, and the United States Supreme Court has recognized two types of sexual harassment claims: (1) those based on requests for sexual favors that result in adverse employment actions and (2) those where bothersome attentions or sexual remarks create a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998); *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998). Here, Smith claims that Bludau's repeated sexual advances toward her created a hostile work environment.

A plaintiff who asserts a Title VII hostile work environment claim must establish that: (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take remedial action. *Septimus v. Univ. of Houston*, 399 F.3d 601, 611 (5th Cir. 2005). For purposes of their motions for summary judgment, Defendants do not dispute that Smith belongs to a protected class or that she was subjected to unwelcome harassment based on her sex. According to Defendants, however, Smith's allegations regarding Bludau's conduct that occurred within the statutory period do not rise to the level of severe and pervasive conduct required to show that the harassment affected a term, condition, or privilege of her employment.

To affect a term, condition, or privilege of employment, the harassing conduct "'must be sufficiently severe or pervasive to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Aryain v. Wal-Mart Stores of Tex., LP*, 534 F.3d 473, 479 (5th Cir. 2008) (quoting *Lauderdale v. Tex. Dept. of Criminal Justice*, 512 F.3d 157, 163 (2007)) (alteration in original). Whether an environment is hostile or abusive enough to support a hostile

work environment claim depends on a totality of circumstances. *Green v. Adm'rs of the Tulane Educ. Fund*, 284 F.3d 642, 655—56 (5th Cir. 2002), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). When examining the totality of the circumstances, a court should focus on such factors as: (1) the frequency of the conduct; (2) its severity; (3) the degree to which the conduct is physically threatening or humiliating; and (4) the degree to which the conduct unreasonably interferes with an employee's work performance. *Id.*; *see also Septimus*, 399 F.3d at 611. The work environment must also be deemed "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Aryain*, 534 F.3d at 479 (quoting *Faragher*, 524 U.S. at 787).

"Incidental, occasional or merely playful sexual utterances will rarely poison the employee's working conditions to the extent demanded for liability. Discourtesy or rudeness, 'offhand comments and isolated incidents (unless extremely serious) will not amount to discriminatory changes in terms and conditions of employment.'" *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 264 (5th Cir. 1999) (quoting *Faragher*, 524 U.S. at 787). To the contrary, "[a]ll of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, longlasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiffs' work environment." *Id.* (citing *Faragher*, 524 U.S. 775; *Ellerth*, 524 U.S. 742; *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75 (1998); *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)); *see also Pennsylvania State Police v. Suders*, 542 U.S. 129 (2004). "The extreme facts recited in those cases highlight the intensity of the objectionable conduct that must be present in order to constitute an actionable hostile environment claim." *Indest*, 164 F.3d at 264.

Giving rise to her hostile work environment claim, Smith alleges that: once, Bludau told her that her "nice cleavage" would help her in her evaluation with another supervisor; once, Bludau showed her and Matula an e-mail with multiple full length photos of naked women on his computer and enlarged his favorite; once, Bludau kissed her and Matula while they were having drinks at a bar after work; once, Bludau hugged and kissed her and Matula good night after walking  them to their car following his daughter's wedding reception; Bludau required that she and Matula have lunch with him nearly ever day or he would get upset; once, Bludau asked her and Matula whether they were "givers" or "receiver" and boasted that he was a "giver;" once, Bludau made a comment that she interpreted as suggesting that she was wearing red lingerie; Bludau called the women in his department "his girls," but stopped when they asked him to do so; Bludau referred to himself as "Daddy" and signed a birthday card for Smith as "Daddy;" and Bludau named two of the cows at his ranch after her and Matula.

Smith has submitted evidence that at least some of this alleged conduct occurred. Bludau admitted during his deposition that he kissed Smith and Matula during happy hour and after a night of drinking at his daughter's wedding. (Bludau Dep. at 99:102—22.) Bludau also admitted that he had pornography on his work computer, although he and Matula both denied that he showed any offensive images to Smith. (*Id.* at 79:5—83:7; Matula Dep. at 7:6-14.) Finally, Bludau also admitted that he called the women in his department "his girls" and that he signed Smith's birthday card "Daddy." (Bludau Dep. at 104:15-21, 112:8-10.) Still, it appears that this conduct was more akin to consensual conduct than harassment. For example, Smith testified during her deposition that Bludau stopped calling her and Matula "his girls" when they asked, but they never asked him to stop saying "daddy." (Smith Dep. at 142:21—143:7; 149:21—150:15.) Smith also testified that she did not tell Bludau to stop when he kissed her. (*Id.* at

171:24—175:20.) Smith further admitted that, immediately before kissing Bludau that night during happy hour, she had also kissed another male supervisor who was sitting at a table with them. (*Id.*) Finally, Smith admitted that she often told adult jokes during her lunches with Bludau and Matula (*Id.* at 131:16—134:6), that she had asked Bludau for a hug at work on at least one occasion (*Id.* at 86:18-20), and that she, too, had pornography on her work computer (*Id.* at 138:10-22.)

Defendants argue that any conduct by Bludau that occurred more than 300 days before Smith submitted her EEOC Charge on April 26, 2010 is time barred and not actionable. *See* 42 U.S.C. § 2000e-5(e)(i); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 109 (2002) (providing that prior to filing a complaint in federal court, a Title VII plaintiff must exhaust her administrative remedies by filing a charge of discrimination with the EEOC within 300 days after the alleged unlawful employment practice occurred). In response, Smith contends that all of Bludau's actions should be considered under the continuing violation doctrine, whereby courts may consider "the entire scope of the hostile work environment claim, including behavior that occurred outside the 300-day window, so long as any act contributing to that hostile environment takes place within the statutory time period." *Lee v. City of Corpus Christi*, 749 F. Supp. 2d 521, 532 (S.D. Tex. 2010) (citing *Morgan*, 536 U.S. at 105) (internal quotations omitted). However, as Defendants point out, "the plaintiff must demonstrate more than a series of discriminatory acts. '[Sh]e must show an organized scheme leading to and including a present violation . . . such that it is the cumulative effect of the discriminatory practice, rather than any discrete occurrence, that gives rise to the cause of action." *Id.* (citing *Huckabay v. Moore*, 142 F.3d 233, 239 (5th Cir. 1998) (internal quotations omitted).

The Court finds that it does not need to determine whether the continuing violation doctrine is applicable here because, even if Smith were able to prove all of her allegations at trial—including those regarding conduct that occurred before June 30, 2009—such behavior is insufficient as a matter of law to constitute conduct so "severe or pervasive" as to alter the conditions of Smith's employment. To the contrary, the Fifth Circuit has affirmed dismissal of female plaintiffs' hostile work environment claims on facts far more egregious than these. *See e.g.*, *Barnett v. Boeing Co.*, 306 Fed. App'x 875, 879 (2009) (employee failed to establish sexual harassment was sufficiently severe or pervasive, despite evidence that a male co-worker leered at her, touched her in sexually inappropriate and unwelcome ways, and actively intimidated her after she complained of his actions); *Hockman v. Westward Commc'ns LLC*, 407 F.3d 317, 328 (5th Cir. 2004) (male co-worker's actions of making one remark to the plaintiff about another employee's body, slapping the plaintiff on her behind with a newspaper, grabbing or brushing against the plaintiff's breast and behind, attempting to kiss the plaintiff on one occasion, and standing in the door of the women's bathroom while the plaintiff was washing her hands were isolated, non-serious events that did not qualify as a hostile work environment); *Shepherd v. Comptroller of Public Accounts*, 168 F.3d 871, 872 (5th Cir. 1999) (male co-worker's conduct was not severe or pervasive where he once remarked that plaintiff's elbows were the same color as her nipples, once told her she had big thighs while pretending to look up her dress, stood over her desk on several occasions and attempted to look down her clothing, touched her arm and rubbed her shoulder on several occasions, and on two occasions patted his lap and said "here's your seat" after she arrived late for office meetings); *Indest*, 164 F.3d at 265 (supervisor's "misbehavior" was neither severe nor pervasive where "[h]is vulgar remarks and innuendos (about his own anatomy) were no more offensive than sexual jokes regularly told on major

network television programs"). *See also Rodriguez v. Flow-Zone, LLC*, 2011 WL 2600568, *6 (S.D. Tex. June 29, 2011) (granting summary judgment in favor of employer where female plaintiff claimed that male coworker once showed her downloaded photographs of women in underwear and an enlarged photo of a woman's vagina; once told another co-worker, within earshot, that "if he had problems . . . with a woman, he would simply put a gun to her head and the problem would be over;" repeatedly used the women's restroom and left the toilet seat up; repeatedly made lewd comments about the plaintiff's clothing, specifically that he liked how her breasts looked in low-cut shirts; once propositioned her to take off her shirt and dance on his desk like a stripper; and once tried to kiss her and then grabbed her arm and laughed after she pushed him away).

The Court recognizes that "there is no mathematical formula to determine whether conduct is sufficiently severe or pervasive to establish a hostile-work-environment claim." *Donaldson v. CDB Inc.*, 335 Fed. App'x 494, 502 (5th Cir. 2009). However, in light of the demanding standard set forth by the Supreme Court and Fifth Circuit, the Court cannot conclude that Bludau's alleged conduct created a working environment that was sexually abusive overall.

Accordingly, Defendants' motion for summary judgment as to Smith's sexual harassment claim is **GRANTED**.

### 2. Retaliation

Even though Bludau's conduct was not so severe and pervasive as to create a hostile work environment as recognized under existing law, Smith may still be entitled to recovery if Defendants retaliated against her for reporting what she believed to be sexual harassment in violation of Title VII. *See* 42 U.S.C. § 2000e-3(a).

In order to make out a *prima facie* case for retaliation, a plaintiff must establish: "(1) the employee has engaged in activity protected by Title VII; (2) the employer took adverse employment action against the employee; and (3) a causal connection exists between that protected activity and the adverse employment action." *Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 878 (5th Cir. 1999). Once the plaintiff sets forth this *prima facie* case, "'the burden then shifts to the employer to articulate a legitimate . . . non-retaliatory reason for its employment action.'" *Aryain*, 534 F.3d at 484 (quoting *McCoy v. City of Shreveport*, 492 F.3d 551, 557 (5th Cir. 2007).  If the employer meets this burden of production, the plaintiff then bears the burden of proving that the employer's reason is a pretext for the actual retaliatory reason. *Id.*

Smith claims that she "clearly engaged in protected activity when she complained of Bludau's sexually harassing behavior both reasonably and in good faith" and "also clearly suffered an adverse employment action—she was fired." (Pl. Amended Compl., Dkt. No. 20 ¶ 137.) Although complaining about Bludau's alleged harassment is protected behavior under Title VII, as discussed at length in Part III.A *supra*, the evidence shows that Smith was not fired, but instead voluntarily resigned. Even if Smith is correct in her claim that Defendants were upset about her sexual harassment complaint and were relieved after she resigned, "a retaliatory termination cannot occur after a resignation." *See Larry v. Grice*, 156 F.3d 181, 1998 WL 546447, *2 n.4 (5th Cir. 1998) (citing *Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 709 (5th Cir. 1997)).

Accordingly, Defendants' motion for summary judgment as to Smith's retaliation claim under Title VII is **GRANTED**.

### C. Defamation

"Defamation is a false statement about a plaintiff published to a third person without legal excuse which damages the plaintiff's reputation." *Moore v. Waldrop*, 166 S.W.3d 380, 384 (Tex. App.—Waco 2005, no pet.). To maintain a cause of action for defamation under Texas law, the plaintiff must prove that: (1) the defendant published a false statement about the plaintiff; (2) the statement was defamatory concerning the plaintiff; and (3) regarding the truth of the statement, the defendant acted with (a) actual malice if the plaintiff was a public official or public figure, or (b) negligence if the plaintiff was a private individual. *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998).

Here, Smith claims that "Defendants published statements about Ms. Smith—that she had abandoned or quit her job on April 19, 2010—that were defamatory towards Ms. Smith, and they did it knowing that their statements were false and with reckless disregard of their truth." (Compl. ¶ 146.) Specifically, Parsley told Hagan, Blanchard, and Elsik that Smith "abandoned her job." Blanchard, in turn, told his boss, a CHS VP named Michael Portacci; CHS HR workers Sam Pettit and Jan Ellis; DeTar risk manager Katrina Lowery; CHS VP Rob Horrar, and potentially others that Smith quit her job. Finally, Hagan, in turn, told his adult son and wife that Smith quit her job. According to Smith, now it is "all over Victoria" that she quit or abandoned her job.

As noted above, the first element of defamation in Texas is that the defendant must have made a false statement about the plaintiff. Because Smith did in fact quit or abandon her job, any statement to this effect cannot be actionable. Moreover, Smith admits that the reason it's "all over Victoria" that she quit her job is because of an article about this lawsuit in the local paper,

and that Defendants had no involvement in publishing the newspaper article. (Smith Dep. at 337:16-25.)

Accordingly, Defendants' motion for summary judgment as to Smith's defamation claim is **GRANTED**.

## IV. Conclusion

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment (Dkt. No. 31) and Supplemental Motion for Summary Judgment (Dkt. No. 44) are **GRANTED**, and this action is **DISMISSED**.

It is so **ORDERED**.

**SIGNED** this 11th day of July, 2012.


_____
JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE